# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### SHREVEPORT DIVISION

| | |
|---|---|
| DANYELL D. BELVIN | CIVIL ACTION NO. 05-0757 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| KANSAS CITY SOUTHERN RAILROAD CO. | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment filed by the Defendant, Kansas City Southern Railroad Co. ("KCS"). [Doc. No. 36]. Plaintiff, Danyell D. Belvin ("Belvin") has sued KCS for alleged race discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. Specifically, Belvin brings claims for (1) a racially hostile work environment and (2) discriminatory discipline. Defendant moves for summary judgment dismissing all of Plaintiff's claims. Plaintiff opposes the motion. For the reasons which follow, the Court finds that there are no genuine issues as to any fact material to Belvin's claims and that KCS is entitled to judgment as a matter of law.

## FACTUAL BACKGROUND[1]

### I.     Plaintiff's Employment.

Belvin began working for KCS as a clerk at its Latanier, Louisiana location in 1995. [Ex. A (Belvin Depo.) at 14-15; 18]. Approximately two years after Belvin was hired, KCS centralized all of its clerks to one location in Shreveport, Louisiana, known as the Customer

---

[1]Belvin failed to offer any competent summary judgment evidence to refute the statement of uncontested facts submitted by KCS. Accordingly, those facts are deemed admitted and are relied on heavily by the Court. See Local Rule 56.2.

Service Center ("CSC"). Belvin therefore transferred to the CSC and continued working as a clerk. Belvin's CSC clerk job was similar to his Latanier clerk job in that he still maintained records of trains, but the CSC clerk job was more automated through the use of computers. [Id. at 16-18; 22-23; 37-; 40-42]. After a series of disciplinary actions over the course of his employment, Belvin's employment was ultimately terminated in May 2004.

## II.    Defendant's Anti-Harassment Policy.

KCS has historically had a number of policies in place that specifically addressed the company's prohibition on discrimination and harassment, including the Equal Employment Opportunity Policy, the Anti-Harassment Policy and the Business Ethics and Compliance Policy. [Ex. E (Venditti Depo.) at 61-64]. KCS' Equal Employment Opportunity and Anti-Harassment Policies have been in effect since at least 1992. The Business Ethics and Compliance Policy has been in effect since at least 1995. [Ex. E at 62-64; Exs. E1-E4; Ex. A. at 136; Ex. A3].

## III.   Plaintiff's Allegations of a Racially Hostile Work Environment.

Belvin admits that he has never been called any names based upon his race nor has any KCS employee ever referred to him in a way which he thought was racially discriminatory. [Ex. A at 97-98]. However, he complains about a handful of incidents which occurred with his various supervisors.

### A.    An incident with Larry Stevenson in 2000.

In May 2000, then CSC Director Larry Stevenson asked Belvin to come to his office. Belvin "estimated" that he was being called into Stevenson's office for a "discipline issue." [Ex. A at 75-76]. Belvin took fellow CSC clerk Sebastian Lawhorn with him as a witness. When Belvin arrived in the office, Stevenson told him that he would not allow Lawhorn to be present

for their conversation. [Id. at 76-77; 86; 90-91]. Stevenson then told Belvin, "That's it. Get up and get your shit and leave." [Id. at 77-78; 91-93]. Belvin got up and proceeded to walk out of Stevenson's office. Belvin claims that Stevenson walked up behind him and pushed him out of the office. [Id. at 78-79].

Belvin's Union steward, Donald Johnston, immediately learned of this incident and met with Stevenson. Stevenson told Johnston that he did not push Belvin, but had put his hand on his shoulder. [Id. at 79-81; Ex. C (Johnston Depo.) at 209-213]. After meeting with Stevenson, Johnston told Belvin that he was not fired and that he should go back to the CSC and talk with Stevenson. When he did, Stevenson told him that he was going to forget it ever happened. [Ex A. at 79-82; Ex. C at 209-213].

Belvin filed a grievance about the incident and learned that KCS was going to conduct an internal investigation. Assistant Chief Transportation Officer of Network Services Steven Hefley came from KCS headquarters in Kansas City to conduct the investigation and meet with Belvin. [Ex. A at 82-83:10]. Shortly thereafter, Belvin received a letter from Hefley stating that he had conducted a thorough investigation and found that there was no support for Belvin's grievance. Specifically, Hefley found that Stevenson had not pushed Belvin, but rather had put his hand on Belvin's shoulder. [Id. at 83; 140-141; Ex. A7].

## B.    A handful of comments by Barbara Sheppard.

Belvin's dealings with CSC supervisor Barbara Sheppard were relatively few, as she was not someone with whom he really had contact. [Ex. A at 68-69]. However, Belvin complains about several comments made by Sheppard. In May 1999, she told him that he was being insubordinate. [Id. at 176-177; Ex. A14]. In March 2000, she told Belvin he was

"full of shit." [Id. at 71-75; 99; 176-177]. On April 22, 2003, she told him that he was being "defiant." [Id. at 176-177; Ex. A14].

Belvin felt that these comments by Sheppard were negative because he did not feel they accurately described his behavior. On April 24, 2003, Belvin submitted a written complaint detailing these incidents to David Ebbrecht, who had recently taken over leadership of the CSC. [Id. at 67-68; Ex. F (Ebbrecht Depo.) at 69:2-7]. Upon receiving Belvin's complaint, Ebbrecht asked Director of Human Resources Rich Venditti to come from KCS headquarters in Kansas City to jointly investigate Belvin's complaint. Ebbrecht wanted to ensure that Belvin's work environment was one in which he felt would be treated fairly and equitably. [Ex. F at 28-29].

Less than one week after receiving his complaint, Ebbrecht and Venditti met with Belvin. [Ex. E at 49; Ex. F at 29-31]. During this meeting, Belvin described the incidents with Sheppard that were detailed in his written complaint. He also complained that in early 2003, Sheppard determined Belvin was not qualified to perform the POD Leader position. [Ex. E 19-22; 69-70; Ex. F at 32-33; 66-67]. Ebbrecht and Venditti assured Belvin that he had a clean slate and that he should immediately address any future concerns directly with Ebbrecht. [Ex. E at 16-17; Ex. F at 29-31]. Ebbrecht and Venditti told Belvin that they would counsel Sheppard on her tone and choice of words with Belvin. Venditti also went over KCS' Anti-Harassment Policy and told Belvin he did not have to fear reprisal in raising any future concerns. [Ex. F at 29-31; Ex. A at 197-198].

### C. An incident with David Ebbrecht in 2003.

CSC employees are granted vacation time based upon their Union seniority. When an employee's seniority comes up for vacation, it is that employee's responsibility to schedule

vacation in advance so that CSC management can ensure it will have a sufficient workforce. [Ex. F at 17-18]. At the end of 2003, Belvin asked to use the three weeks of vacation he had accrued before year-end. However, December is a high vacation month. Since the maximum amount of CSC clerks were already scheduled to take vacation during that time, CSC supervisor Billie McCloud told Belvin that he would not be able to take his vacation at year-end. [Ex. A at 189-190; Ex. A21; Ex. F at 15-16]. Belvin worked through his vacation, but then claimed overtime on his weekly timesheet so that he would be paid for working through his vacation. [Ex. A at 190-191].

Upon receiving Belvin's timesheet, Ebbrecht told Belvin that he had not filled it out correctly. Ebbrecht explained that Belvin could not claim overtime because he had not worked overtime that week. Ebbrecht asked him to fill out his timesheet correctly without claiming the overtime. [Ex. A at 193-193; Ex. F at 14-16]. He told him to claim the straight time he actually worked, then file a claim through his Union for the vacation that he missed. [Ex. F at 19-21; Ex. A21]. Ebbrecht explained that since he had failed to schedule his vacation beforehand, this was the proper protocol. Belvin questioned Ebbrecht's reasoning, and began to read portions of the union agreement to him. [Ex. A at 191-193; Ex. F at 15-17; 19-21; Ex. A21]. Ebbrecht said that Belvin was being disrespectful and he wasn't going to stand for it. [Ex. A. at 192].

Once Belvin submitted his claim for vacation pay through the proper channels with the Union and the Labor Relations Department, Ebbrecht granted Belvin the requested vacation pay. [Ex. C at 193-194; Ex. F at 19-21; 23]. This resolution in Belvin's favor eliminated his grievance on the issue. [Ex. C at 208-209].

## IV.  Plaintiff's Suspension in 2001.

In July 2001, Belvin failed to complete two work orders before the end of his shift.  [Ex. G; Pl.'s Pet. at ¶ 15].  He was given the option of undergoing a formal investigation or waiving his rights to the formal investigation by accepting responsibility and a three-day suspension. Belvin opted to execute the waiver, which stated:

> I, Danyell Belvin, accept my responsibility for failure to complete two [2] Baton Rouge work orders on July 20, 2001.  I realize that I will receive three [3] days suspension.  Enforcement of my suspension will begin August 1, 2001 and run through August 3, 2001.
> I understand that this letter will be placed in my personnel file. My signing below serves as acceptance of this suspension and agreement to waive my right to a formal investigation in this matter.

[Ex. G; Pl.'s Pet. at ¶ ¶15-16; Ex. H].

On October 2, 2001, Belvin filed a grievance with CSC Director Janice McNeal requesting that his suspension be withdrawn.  [Pl.'s Pet. at ¶ 18].  On October 11, 2001, McNeal denied Belvin's grievance as untimely and moot since he had waived his rights to a formal investigation and accepted responsibility and the three-day suspension.  [Ex. I].

## V.  Plaintiff's Suspension in 2003.

On June 3, 2003, CSC supervisor Jennifer Fussell went to Ebbrecht visibly upset and crying about an interaction she had with Belvin.  Ebbrecht asked Fussell to collect herself, think about exactly what happened, and memorialize what happened in writing for him.  Later that day, Fussell sent Ebbrecht an e-mail which stated that she had been trying to assist Belvin with a problem regarding the status of a train car.  According to Fussell, Belvin was resistant to her approach and refused to answer her questions.  [Ex. F at 36-37; Ex. F5]. Fussell also expressed concern that Belvin had addressed her as "sweetie" on two previous

occasions and that she had asked him not to call her that or any other term outside of her name. Despite these instructions to Belvin, Fussell complained that he had again called her "sweetie" when she was trying to assist him earlier that day. She felt that Belvin had disrespected her authority and disregarded her instructions. [Ex. F5]. Based on Fussell's statement, Ebbrecht believed that the issue warranted charges and a formal investigation.

A formal investigation hearing was held before Investigation Hearing Officer Mark Dabney on June 11, 2003. During this formal investigation, Belvin's union steward presented evidence and advocated on Belvin's behalf. [Ex. A at 183-184; Ex. A16; Ex. C at 189]. After reviewing the evidence presented during this investigation, Dabney found sufficient evidence that Belvin failed to follow Fussell's instructions and used improper and inappropriate language by referring to her as "sweetie." [Ex. A at 183-184; Ex. A16]. Dabney found that Belvin's conduct was in violation of several KCS policies, including the Anti-Harassment Policy. He was issued a ninety-day suspension for these violations. [Ex. A16].

Belvin appealed his discipline through his union up to a neutral arbitrator. The matter was resolved in Belvin's favor. The suspension was overturned and Belvin was compensated and made whole for the time he was off. [Ex. A at 183-184; Ex. C 191-192; Ex. C11].

## VI.    Plaintiff's First Termination.

On November 29, 2001, Belvin was charged with improper and unauthorized use of company equipment for logging onto an unauthorized internet website. [Ex. A at 141-143; Ex. A8]. Belvin was given the option of undergoing a formal investigation or accepting responsibility and a 60-day suspension for his unauthorized use of company equipment. Belvin voluntarily waived his rights to a formal investigation and accepted the 60-day suspension. [Id. at 143-145; Ex. A9].

During 2002, KCS management began to be concerned that it had a serious problem with regard to its employees' use of company information resources, specifically with respect to the inappropriate use of company e-mail. Such use was in violation of KCS's longstanding Use of Information Resources and Business Ethics and Compliance Policies, among others. [Ex. B (Alexander Decl.) at ¶ 7; Ex. E1, E3, E4]. In light of this concern, KCS launched a large scale, random audit of e-mail files in the Fall of 2002. This audit confirmed that a large group of employees were using company e-mail to exchange inappropriate and other non-business materials. [Ex. B at ¶ ¶ 8-9].

The audit revealed various degrees of volume and content among the employees audited, and a large number of employees at every level of the company were disciplined up to and including termination of employment. [Id. at ¶ 10]. In addition to this audit and the resulting disciplinary actions, KCS magnified its efforts to proactively deter employee misuse of its information resources. For example, the company established quarterly random audits of employee e-mail files at all levels of the company, and revised and republished all relevant policies addressing proper use of KCS's information resources. [Ex. B at ¶ 11]. The revised relevant policies further emphasized the prohibition of storage or failure to delete inappropriate and non-business related materials in any business system or file. [Id. at ¶ 12; Ex. E4; Ex. E5].

KCS went to great lengths to inform its employees of its expectations with respect to the relevant policies. For example, KCS sent copies of the revised relevant policies to employees' homes with an explanation of the policies and consequences for any violations. [Ex. D (Freeman Depo.) at 147-148; 202-203; Ex. E7]. Moreover, a senior management team, including KCS's President and Vice President of Human Resources, traveled across the

company giving town hall meetings regarding the policies and consequences of any violations. [Ex. B at ¶ 11; Ex. D at 147-149]. On October 16, 2002, then CSC Director Janice McNeal sent an e-mail to all CSC employees as a follow-up to the town hall meeting held in the CSC. In this e-mail, McNeal emphasized the prohibition on use of company information resources for non-business activities and invited anyone with questions to contact her or any other CSC supervisor, as well as the Human Resources Department. [Ex. D at 198-201; Ex. D2]. KCS also installed a "pop up" window on employees' computers, so that employees had to acknowledge their understanding of the relevant policies anytime they logged onto their computers. This "pop up" also described the consequences for violating the relevant policies. [Ex. D at 204-206].

In October or November 2003, Ebbrecht learned that some CSC employees were spending company time misusing the Internet for non-business purposes. Ebbrecht called the Human Resources Department to inquire about possibly conducting an audit into such misuse. [Ex. F at 73-74; 78-79]. Human Resources asked Ebbrecht to submit a list of those employees suspected of misusing the company's information resources for an audit. Ebbrecht therefore called a staff meeting and asked the CSC managers to write down the names of employees they suspected of misusing the company's information resources. Ebbrecht consolidated all of the names given to him by his management team into a list of 23 employees. [Id. at 74-75; 80]. Before submitting this list of 23 names to the Human Resources Department for the audit, Ebbrecht created a staffing chart that included certain background and discipline history information about the 23 employees at issue. Ebbrecht created this chart so that he could have a sense of what his staffing levels would be if the audit revealed violations of company policy warranting dismissals. [Ex. F at 76; 80-82]. After

creating the staffing chart, Ebbrecht submitted the list of names to Human Resources for the audit. [Ex. F at 80; 84].

In December 2003, Ebbrecht called Director of Labor Relations John Morse to inquire about the status of the e-mail audit. Ebbrecht learned that the e-mail audit committee initially began to audit the employees on the list he submitted, but found enough inappropriate material that it decided to disregard the list of 23 names and audit all of the CSC employees. [Ex. F at 89-90]. This e-mail audit was performed on all CSC employee e-mail files in the Fourth Quarter of 2003.

The audit revealed that Belvin's e-mail file contained a large volume of non-business materials, some of which included nudity, sexually explicit and/or sexually suggestive content. In addition to storing and/or failing to delete such items, the audit revealed that Belvin had also transmitted some of the items to others. [Ex. B at ¶ 13]. Based on these audit results, Belvin was charged with transmitting, storing, failure to delete, and/or remove emails containing nudity and/or sexually explicit or suggestive, inappropriate and non-business material from his company e-mail file in violation of company policy. A letter was sent to Belvin which detailed these charges and set a date for his formal investigation hearing. [Ex. A at 205; Ex. A26; Ex. D at 44].

A formal investigation was held before Investigation Hearing Officer Dan Freeman on March 30, 2004. During this formal investigation, Belvin's union steward presented evidence and advocated on Belvin's behalf, and Belvin had the opportunity to tell his side of the story. [Ex. D at 39; 213-215]. KCS also presented evidence during the investigation. Regina Reynolds, who was a director in KCS's IT Department, presented evidence of approximately

600 inappropriate or otherwise non-business e-mails contained in Belvin's e-mail file, some of which Belvin had forwarded to others.  [Ex. D at 90; 211-213; Ex. D6].

After reviewing the evidence presented during this investigation, Freeman found sufficient evidence that Belvin violated several company policies and rules by transmitting, storing, failing to delete, and/or removing emails containing nudity and/or sexually explicit or suggestive, inappropriate and non-business material from his company e-mail file.  On April 7, 2004, Belvin's employment was terminated for these violations. [Ex. A33; Ex. A at 104; 208; Ex. D at 63-64; 78; 86; 194; 215].

The Fourth Quarter e-mail audit of the CSC revealed that other CSC employees had used company e-mail to exchange and store inappropriate and other non-business materials. Numerous CSC employees received varying levels of discipline based on the degree of volume and content at issue.  [Ex. B at ¶ 14].  Twelve of these employees were dismissed from service as a result of their misuse of company information resources, including Belvin. [Id.; Ex. A at 104].

The union appealed these dismissals and KCS and the union ultimately settled the claims.  Pursuant to this settlement, the twelve CSC employees who were dismissed as a result of the e-mail audit were entitled to reinstatement with pay for all time lost.  [Ex. B at ¶ ¶15-16].  Consequently, Belvin received pay for all time lost and was made whole with respect to his dismissal for misusing company e-mail.  [Ex. A at 221; Ex. A42; Ex. B at ¶17].

VII.    **Plaintiff's Second Termination.**

During Belvin's formal investigation hearing on March 30, 2004, Belvin presented the staffing chart created by  Ebbrecht in connection with the list of 23 names he had submitted for an e-mail audit.  This staffing chart had been improperly removed from either from

Ebbrecht's office or from manager Debbie Liddell's desk without authorization. Either way, Belvin did not have authority to possess the stafffing chart, as it was a confidential management document which contained sensitive employee information. [Ex. A at 119-121; Ex. D at 159; 171-173; 176-177; Ex. F at 84].

During the investigation, Hearing Officer Freeman asked Belvin where he got the staffing chart, but he refused to answer. [Ex. D at 161-162; 173-174]. Two days later, on April 1, 2004, the staffing chart was faxed into the CSC Panagon System, thus making it available to all CSC employees. The Panagon System is where CSC employees receive information pertaining to cars, billing information, and other rail operations, and is reserved for such business use only. [Ex. A at 208:3-9; Ex. D at 180-181]. The fax line on the staffing chart showed that it had been faxed into the CSC Panagon System from a local Kinko's in Shreveport. Ebbrecht asked CSC supervisor Billie McCloud to go to Kinko's to review the relevant security video and determine whether any CSC employee had faxed the staffing chart into the Panagon System. [Ex. D at 181; 184-188]. McCloud reviewed the Kinko's security video and positively identified Belvin as the person who faxed the staffing chart. [Id. at 181; 184-188].

Based on this information, Belvin was charged with having knowledge of the removal and/or removing a railroad document without authority and faxing it into the CSC Panagon System in violation of company policy. Belvin received a letter detailing these charges and setting a date for his formal investigation hearing. [Ex. A at 118-119; 207-208; Ex. A32]. A formal investigation was held before Hearing Officer Freeman on May 19, 2004. During this formal investigation, Belvin's union representative presented evidence and advocated on Belvin's behalf, and Belvin had the opportunity to tell his side of the story. [Ex. A37; Ex. D at

162; 213-215]. There was also evidence presented by KCS that Belvin faxed the staffing chart into the CSC Panagon System. Specifically, McCloud presented the relevant Kinko's security video and unequivocally identified the person in the video as Belvin. [Ex. D at 181; 184-188].

After reviewing the evidence presented during this investigation, Freeman found sufficient evidence that Belvin violated several company policies and rules by having knowledge of the removal and/or removing a railroad document without authority and faxing it into the CSC Panagon System. On May 27, 2004, Belvin's employment was terminated for these violations. [Ex. A at 210; Ex. A37; Ex. D at 165-167].

Belvin appealed this discipline through his union up to a neutral arbitrator, who denied his appeal and upheld Belvin's dismissal, concluding that:

> [T]he fact that, upon its receipt by [Belvin], he failed to return a piece of paper that clearly was a Management document to a [KCS] officer and instead sought to introduce it for his own benefit in an official Company proceeding, clearly implicates him in an improper activity. This was a dishonest act and he clearly was violative (sic) of Rule 1.6, Conduct.

[Ex. C at 206; Ex. D at 188; 218; Ex. J at 5].

## LAW AND ANALYSIS

### I.    Summary Judgment Standard.

Summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); New York Life Ins. Co. v. Travelers Ins. Co., 92 F.3d 336, 338 (5th Cir. 1996). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); see also, Gunaca v. Texas, 65 F.3d 467, 469 (5th Cir. 1995). A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting Celotex, 477 U.S. at 323-25, 106 S. Ct. at 2552). If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." Little, 37 F.3d at 1075.

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. Wallace v. Texas Tech Univ., 80 F.3d 1042, 1046-47 (5th Cir. 1996). The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. Little, 37 F.3d at 1075; Wallace, 80 F.3d at 1047. Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Wallace, 80 F.3d at 1048 (quoting Little, 37 F.3d at 1075); see also, S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 494 (5th Cir. 1996). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." McCallum Highlands v. Washington Capital Dus, Inc., 66 F.3d 89, 92 (5th Cir. 1995), as revised on denial of rehearing, 70 F.3d 26 (5th Cir. 1995). Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-51, 106 S. Ct. 2505, 2511,

91 L. Ed. 2d 202 (1986). When the nonmovant has the burden of proof at trial, he "must come forward with evidence which would be sufficient to enable it to survive a motion for directed verdict at trial." Stults v. Conoco, Inc., 76 F.3d 651, 656 (5th Cir. 1996). If the nonmovant cannot meet this burden, then "the motion for summary judgment must be granted." Id., Little, 37 F.3d at 1076.

In order to determine whether or not summary judgment should be granted, an examination of the substantive law is essential. Substantive law will identify which facts are material in that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510.

## II.    Plaintiff's Claims of Discriminatory Discipline.

### A.    Plaintiff's Suspension Claim.[2]

In a deferral state such as Louisiana, a charge of discriminatory conduct must be filed with the EEOC within 300 days after the alleged unlawful act occurs. See 42 U.S.C. §§ 2000e-5(e); EEOC v. Commercial Office Prods. Co., 486 U.S. 107, 111 (1988). Belvin complains that he was suspended on June 3, 2003 for calling a supervisor "sweetie." [Doc. No. 42, Ex. A]. According to the record before the Court, the only Charge of Discrimination to the EEOC which complains about that suspension (which was ultimately overturned) was filed on June 15, 2004. Since Belvin failed to file his charge within 300 days of the suspension, his claim of discrimination regarding that suspension is untimely.

---

[2]It does not appear that Belvin is making a claim concerning his 2001 suspension for his failure to complete two work orders. In any event, any claim concerning that suspension would be untimely.

## B.     Plaintiff's Termination Claims.

Since Belvin has offered no evidence of direct discrimination, this claim is properly analyzed under the familiar standard of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).   To prevail, he must first establish a *prima facie* claim of discrimination.   KCS must then articulate a legitimate, non-discriminatory reason for its decision.   Once done, "the plaintiff must then offer sufficient evidence to create a genuine issue of material face 'either (1) the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protect characteristic (mixed-motive analysis).'" Rachid v. Jack in the Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004).

A *prima facie* case of race discrimination requires that Belvin show that he: (1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or that others similarly situated were treated more favorably.  Young v. 7-Eleven, Inc., 170 Fed. Appx. 302, 304 (5th Cir. 2006)(*citing* Okoye v. Univ. of Tex. Houston Health Sci. Ctr., 245 F.3d 507, 512-13 (5th Cir. 2001)).   The *prima facie* case, once established, raises an inference of intentional discrimination and the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  Id. If the defendant satisfies this burden, the plaintiff must prove that the proffered reasons are pretextual.  Id. Once a Title VII case reaches this pretext stage, "the only question on summary judgment is whether there is a conflict in substantial evidence to create a jury question regarding discrimination." Id.

### 1.    Plaintiff's April 2004 termination.

Belvin is in a protected category (black) and suffered an adverse employment action (termination).[3] However, he has not submitted any evidence that he was replaced by a white employee.  Accordingly, whether he has stated a *prima facie* claim of discrimination will depend upon whether he can show that a similarly-situated white employee was treated more favorably.

Belvin was originally terminated after a KCS investigation concluded that he had violated several company policies and rules by transmitting, storing, failing to delete, and/or removing e-mails containing nudity and/or sexually explicit or suggestive, inappropriate and non-business material from his company e-mail file.  He claims in his opposition brief that "other offenders were giving warnings and reprimands for the same offense."  [Doc. No. 40 at 7].   However, the only competent summary judgment evidence submitted by Belvin concerns Debbie Liddell.  However, during the relevant time period (late 2003 to early 2004), Liddell was in a management position in the Systems Transportation Center.  [Ex. F at 10]. Since Liddell was in management and worked in a different department, she was not similarly-situated to Belvin. See Wyvill v. United Companies Life Ins. Co., 212 F.3d 296 at 306 (5th Cir. 2000).   Since Belvin failed to submit competent evidence concerning any other alleged comparators, he has failed to establish a *prima facie* claim of discrimination with regard to the first termination.

_____

[3]The Court is not convinced that Belvin's first termination, which was ultimately overturned, is even actionable.  However, since the Court finds that this claim fails on the merits, the Court need not make that determination.

## 2. Plaintiff's May 2004 termination.

Like his first termination claim, whether Belvin has stated a *prima facie* claim of discrimination concerning his May 27, 2004 termination will depend upon whether he can show that a similarly-situated white employee was treated more favorably. Belvin was terminated a second time after a KCS investigation found sufficient evidence that he had violated several company policies and rules by having knowledge of the removal and/or removing a railroad document without authority and faxing it into the CSC Panagon System. Belvin first argues that he need not show a similarly-situated white employee was treated more favorably since the railroad document which was the basis for his termination was "racially-pretextual." [Doc. No. 40 at 20]. However, the fact that the staffing chart which listed employees suspected of being in violation of the e-mail policy indicates whether the employee is a minority (as well as whether he has a disciplinary history, the severity of the suspected infraction, and the recommended discipline) does not suggest that Belvin's discharge for *obtaining and disseminating* this confidential information was racially pretextual.[4]

In an attempt to establish a *prima facie* claim, Belvin alleges that Michelle Chauvin was treated more favorably than him. Belvin claims that he and Chauvin were similarly-situated in that both defended themselves at formal hearings. However, there is no evidence which indicates that Chauvin attempted to defend herself with a confidential management document or that she faxed such a sensitive document to other employees two days after refusing to

---

[4]Belvin makes much of the fact that the document was created as a staffing tool for Ebbrecht's personal use and was not an "official" railroad document. However, whether the document was an "official" railroad document or merely a confidential document created as a staffing tool for the use of one of the railroad's managers is of no consequence.

disclose how she obtained it.[5]  As such, Belvin has failed to establish that a similarly-situated

employee was treated more favorably and thus has failed to establish a *prima facie* claim of

discrimination.  Summary judgment is appropriate as a matter of fact and law on Belvin's

discipline claims.

**III.    Hostile Work Environment Claim.**

Belvin also alleges a claim for a hostile work environment.  To establish his claim,

Belvin must show that:

> 1) he belongs to a protected class; 2) he was subjected to
> unwelcome harassment; 3) the harassment was based on race;
> 4) the harassment affected a term, condition or privilege of
> employment; and 5) the employer knew or should have known of
> the harassment and failed to take remedial action.

Septimus v. Univ. of Houston, 399 F.3d 601, 611 (5th Cir. 2005).  Furthermore, he must show

that the conduct was severe or pervasive. The alleged discrimination must have "created an

environment that a reasonable person would find hostile or abusive." Id.  Courts determine

hostile environment considering the totality of the circumstances.  Factors to consider include:

"the frequency of the conduct, its severity, the degree to which the conduct is physically

threatening or humiliating, and the degree to which the conduct unreasonably interferes with

an employee's work performance." Id.; see Harris v. Forklift Systems, Inc., 510 U.S. 17, 23,

114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

In order to meet his burden, Belvin must show more than a few isolated incidents of

racial harassment.  See Snell v. Suffolk County, 782 F.2d 1094, 1103 (2d Cir.1986).  Instead,

there must be a steady barrage of discriminatory comments.  See Schwapp v. Town of Avon,

---

[5]The sensitivity of the document is apparent, as it list both the disciplinary history
and the recommended discipline for several KCS employees.

118 F.3d 106, 110 (2d Cir. 1997).  A hostile work environment can only be found when the workplace is "permeated" by the offensive conduct.  Id.  A plaintiff's own subjective beliefs, however genuine, cannot  form the basis of judicial relief.  Nichols v. Lewis Grocer, 138 F.3d 563 (5th Cir. 1998); Little v. Republic Refining Co., 924 F.2d 93, 95 (5th Cir. 1991).

Belvin complains about one incident with Larry Stevenson in 2000, a handful of "verbal insults" from Barbara Sheppard, and one incident with David Ebbrecht in 2003.  This is the extent of his alleged racial harassment.  However, he admits that he has no evidence of any race-based comments or racial slurs.  [Doc. No. 36-5, Ex. A. at 98-99].  Although Belvin asserts in his opposition brief that the alleged harassment was based on his race, he has failed to offer any competent summary judgment evidence to support this conclusion.  Indeed, he has failed to show any link whatsoever between the offending comments and his race.  Further, even if he could establish a racial motivation, the few isolated incidents of which he complains, which span a period of four years, were neither severe nor pervasive.  Accordingly, the Court finds that summary judgment is proper as a matter of fact and law on Belvin's hostile environment claim.[6]

## CONCLUSION

For the foregoing reasons, the Court finds that there are no genuine issues of material fact and that summary judgment is proper as a matter of fact and law dismissing all of Plaintiff Danyell D. Belvin's claims.

_____

[6]Since Belvin has failed to state a claim for a racially hostile environment on the merits, the Court need not decide whether he exhausted his administrative resources or consider the applicability of the Faragher/Ellerth affirmative defense.

Therefore:

**IT IS ORDERED** that the Motion for Summary Judgment filed by the Defendant [Doc.

No. 36] be **GRANTED,** and that Plaintiff's claims be dismissed, with prejudice, at his sole cost.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 6th day of December, 2006.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE